# Plowman v. Thornton.

*Summary Proceeding under the Statute to compel the Delivery of Books and Papers.*

1. *Summary proceeding to compel delivery of property of public office; when order should not be made.* — The relator is not entitled to an order under the statutes to compel the delivery to him of the books and property of a public office, unless he exhibits a clear *primâ facie* title to it, free from all reasonable doubt.

2. *Same; what clear primâ facie title.* — A commission from the governor issued on a certificate of election, or a certificate disclosing a vacancy in office made by an officer having authority to certify it, whether the certificate be true or false, confers a clear *primâ facie* title to the office entitling the person commissioned after due qualification to enter upon the discharge of the duties of the office, and to have the custody of the property pertaining to it.

3. *Same.* — The *primâ facie* title thus acquired is conclusive until the ultimate right to the office is determined on *quo warranto*, or information in the nature of *quo warranto*. No inquiry as to the truth or falsity of the certificate, upon which the commission is based, can be entertained in any mere collateral proceeding.

4. *Same; when certificate of vacancy is a nullity.* — Where, however, the certificate of vacancy discloses facts, which, legally construed, show that no vacancy exists in the office, the certificate destroys itself and affords no support to a commission based on it. Such a commission is without force for any purpose, and does not confer even a *primâ facie* right to the office.

5. *Constitutional Convention of 1867; powers of.* — The powers of the Constitutional Convention of 1867, held under the "Reconstruction Acts" of Congress, were special and limited, and it had not legislative power; but in the power conferred was embraced authority to adopt an ordinance putting in operation the governmental agencies it established in the Constitution, and so organizing them that when the government came into existence, it would continue without an interregnum of power or officers in all its departments.

6. *Ordinance No. 32; validity of.* — Ordinance No. 32 of that Convention, providing that the officers first elected under the Constitution should hold their offices for the term prescribed, and until their successors were elected and qualified, was a valid exercise of this power. The approval by a judicial officer, who was one of the first elected under the Constitution, of an official bond after the election, but before the qualification of his successor, is, in all respects, valid and binding.

THIS was a summary proceeding commenced by the appellee, W. H. Thornton, before the judge of the 10th judicial circuit (Hon. JOHN HENDERSON), to compel appellant, George P. Plowman, to deliver up to appellee, as his duly qualified successor, the books and papers pertaining to the office of probate judge of Talladega county, which it was alleged appellant had vacated by failing to file his official bond, properly approved, as required by law. The appellant, on the hearing before the circuit judge, moved to quash the complaint, and reserved numerous exceptions which need not be further noticed.

The evidence shows that Plowman had been duly elected probate judge at the general election held November 3, 1874,

[Plowman v. Thornton.]

qualified, commissioned, and had given bond in all respects, as required by law, if his bond filed in the office of the secretary of state was properly approved. The appellee having introduced his commission from the governor, dated January 13, 1875, and proof of qualification, filing bonds, &c., the appellant introduced in evidence a duly certified copy of the certificate of the secretary of state, upon which the governor issued the commission to Thornton. This certificate was as follows: —

"Office of the Secretary of State,
                              "Montgomery, Jan'y 9th, 1875.
" To His Excellency, George S. Houston,
                    "Governor of Alabama :

"Sir, — In compliance with section 164 of the Revised Code of Alabama, I hereby certify to your Excellency the failure of George P. Plowman, who was elected (according to the returns of the election held on the 3d day of November, 1874, on file in this office) to the office of judge of probate for the county of Talladega, to file his bond as probate judge properly approved by any one of the officers designated by the act of August 31st, 1868.

" The bond is herewith submitted purporting to have been approved by B. F. Saffold, justice of the supreme court of Alabama, on the 9th day of November, 1874, whose term of office, according to the opinion of the attorney general of the State, had expired previous to the approval of said bond.

                    "Very respectfully, your ob't s'v't,
                              "R. K. Boyd, Secretary of State."

The bond thus referred to in the certificate was in due form and penalty, and approved by Hon. B. F. Saffold, a justice of the supreme court, on the 9th day of November, 1874. On it was an indorsement of the secretary of state (Hon. N. H. Rice), showing that it had been filed and recorded in that office on the following day. It was also shown that the Honorables R. C. Brickell, Thomas J. Judge, and A. R. Manning, who were elected judges of the supreme court, at the election held on the 3d of November, 1874, were not commissioned, and did not qualify until the 18th day of that month.

There was evidence in the record showing that Judge Saffold was one of the first judges elected under the Constitution, and that ever since the 13th day of July, 1868, he had been recognized by the people and all the departments of the state government, as supreme court judge, up to the time his successor qualified.

The circuit judge made the statutory order to compel the delivery of the books and property, and the appellant, not having made the oath required by law, was ordered to be com-
Vol. lii.

[Plowman v. Thornton.]

mitted to jail until he made the delivery. Plowman appealed, and now assigns this order, among other things, as error.

RICE, JONES & WILEY, for appellant. — Under our statutes, the issuing of a commission where a vacancy has been certified to the governor is purely ministerial. In appointing the particular individual, the governor may exercise political power; but he has no option to appoint or not. The certificate of vacancy makes it his duty to appoint some one. The law pointing out the mode and manner in which the appointment to fill a vacancy *must* be made, no appointment can be made unless those modes have been followed. There must at least be a *proper certificate* by a proper officer, to authorize an appointment to fill a vacancy, whether the vacancy be true or false. The *proper certificate* of vacancy is the *jurisdictional* fact; without it the governor's commission is mere waste paper. Where the certificate of vacancy discloses facts which show that there is no vacancy in the office, it becomes a mere nullity, incapable of conferring rights. 3 West Va. 70; *Hartt* v. *Harvey*, 32 Barbour, 61; 43 Pa. 372. There is no foundation whatever in law for the opinion that a bond approved by Judge SAFFOLD was invalid. He was most certainly a *de facto* officer. *Heath's Case*, 36 Ala.; 37 Maine, 423; 56 Pa. State; 4 Iredell, 135; *Mayor* v. *Stoneum*, 2 Ala.; *Thrower* v. *State*, at last term; *Ex parte Strang*, 21 Ohio, 610; *State* v. *Carroll*, 38 Connecticut, 449. The ordinance of the convention was valid. It simply provided for keeping the machinery of government in motion — to prevent a *hiatus*. *State* v. *Spence*, 7 Ala. 500; *Magruder* v. *Swan*, 25 Maryland, 215. What becomes of this court if appellee's theory of the Constitution is correct? The effect to be accorded the commission of the governor depends on the power he exercises in making it. If the original power to appoint and remove at will rest in him, — in other words, if he is the *sovereign* as to such appointments, — then his commission is entitled to the weight which some of the decisions cited by appellee declare should be accorded to it. As to such appointments the governor is the *sovereign;* as to others, his issue of a commission is a mere ministerial act, — based on facts, the evidence and existence of which the law ascertains and provides in a definite mode, — and no more force can be accorded it than any *other* ministerial act. If there is no certificate of vacancy, there can be no appointment. The governor has no discretion whatever as to the ascertainment of the vacancy. The law does that for him. His commissioning a person to fill the vacancy is a purely *ministerial* act. This distinction reconciles all the cases.

[Plowman *v.* Thornton.]

TAUL BRADFORD and JOHN T. HEFLIN, for appellant. — The governor's commission is *primâ facie* evidence of title to the office, and in cases of this sort conclusive. Leading Cases on Elections, Brightly, 314–20 ; *Ex parte Harris, Ex parte Thompson, Bebee* v. *Robinson,* all at last term. The governor exercises political power in granting these commissions, and his action cannot be controlled or collaterally impeached by the judiciary. *State* v. *Governor,* 1 Dutcher N. J. 348. His commission is " resistless " except in action of *quo warranto,* and this is from grave reasons of public policy. The secretary of state's certificate is in proper form. The statement about the bond filed and approved is mere surplusage. The certificate is merely cumulative evidence. The commission is the highest evidence, and any decision subjecting it to collateral attack is to be deprecated.

Judge SAFFOLD's term having expired on the 13th July, 1868, he no longer had the *reputation* of being such judge, and ceased to be *de facto* judge. *Parker* v. *Kitt,* 1 Ld. Raymond ; *Briggs* v. *State,* 3 Iredell, 358 ; 4 Iredell, 361.

The ordinance, § 4 (Acts, 68, p. 181), provides that the return of the election for state and county officers shall be made to the president of the convention, who shall give certificates of election to the persons elected, which was never done. The act of Congress only provides for one election after the convention assembles ; this election is confined solely to the ratification of the Constitution ; and this act requires the returns to be made to the commanding general of the district. Act of Congress of March 23, '67 ; supplemental to act of March 2, '67, section 4.

" The 5th section of the act of Congress of March 2, '67, provides simply for a constitutional convention, and contains no specific delegation of the power to, or limitation of the powers of such convention. The act of Congress of March 23, '67, provides that the convention 'shall proceed to frame a Constitution and civil government according to the provisions of this act, and the act to which it is supplementary,' and the Constitution when framed shall be submitted by the commanding general to a vote of the registered voters for ratification or rejection, and the returns of the election are required to be made to the commanding general. The 3d section of the act of Congress of June 25, '68, 'to admit the state to representation in Congress,' provides that after ratification of the fourteenth amendment the State shall be admitted to representation in Congress ; and further, ' that thereupon the officers of each State duly elected and qualified under the Constitution thereof, shall be inaugurated without delay.' Vide section 3, act June 25, '68 ; vol. 15 U. S. Statutes at Large, page 74.

[Plowman v. Thornton.]

" These provisions of the Reconstruction Laws, and the act to restore the State to the Union, show that the officers referred to in the 3d section of the act of June 25, '68, are officers to be elected under the Constitution after the passage of this act, and not to those supposed to be elected under the election ordinance at the election commencing February 4, '68. The act of June 25, '68, is prospective in its operation, and is not retrospective or retroactive. The reconstruction laws do not confer power on the convention to adopt the election ordinance. And a constitutional convention does not possess legislative power. Vide Jameson's Constitutional Convention, §§ 415 to 418; §§ 479 to 520. Cooley's Constitutional Limitations, 3d edition, page 30 to 32, and note 1, page 32."

The convention had no power to pass the election ordinance No. 32, and especially is the power defective in adopting the ordinance with provisions in conflict with the Constitution. *Wells* v. *Baine et al.* 75 Pa. State Rep. 25 (P. F. Smith, vol. 25); *Wood's Appeal*, vol. 75 Pa. State Rep. (vol. 25 P. F. Smith) page 59.

BRICKELL, C. J. — 1. This proceeding was commenced by the appellee, claiming to be the successor of the appellant, as judge of probate of Talladega county, under the 6th article, part 1, title 5, chapter 1, of the Revised Code, to compel the delivery of the books, papers, money, and property of the office, which it is alleged the appellant unlawfully withholds. At the present term, in the case of *Thompson* v. *Holt*, we decided that the proceeding could not be supported unless the relator exhibited a *primâ facie* title to the office, free from all reasonable doubt; that a title founded on a commission from the governor issuing on a certificate of election, or a certificate disclosing a vacancy in the office, made by the officer having authority to certify it, until vacated by a judicial determination in a proper proceeding, was a *primâ facie* title, free from all reasonable doubt.

2. The first inquiry presented by the proceeding is the right of the relator to the custody of the property of the office, and that right is incidental to the title to the office. The facts in reference to the title disclosed in the record are, that the appellant was at the last general election duly and constitutionally elected judge of probate of the county of Talladega. On the 9th day of November, 1874, six days after his election, he gave an official bond as such judge, with security, which on that day was approved by Hon. B. F. SAFFOLD, as associate justice of the supreme court. The bond so approved was on the next day filed in the office of the secretary of state, and the appellant having taken the oath of office required by law, was by

the governor duly commissioned, and entered on the discharge of his official duties. On the 9th of January, 1875, the secretary of state certified to the governor that the appellant had failed to file an official bond, properly approved. He appends to the certificate the bond which was filed, and states that according to the opinion of the attorney general, Judge SAFFOLD'S official term had expired before its approval. On this certificate, the governor on the 13th January, 1875, appointed and commissioned the appellee as judge of probate of Talladega county, to fill the vacancy supposed to have been created by the failure of appellant to file an official bond, properly approved.

The statute requires a probate judge, before entering on the duties of his office, to give bond with security, to be approved by a judge of the supreme court, or of the circuit court, or a chancellor. R. C. § 784. Such bond must be filed in the office of the secretary of state. R. C. § 785. On the reception of such bond, properly approved, it is the duty of the governor to forward him a commission. Pamph. Acts 1872–73, p. 29, § 55. A failure to file an official bond operates a vacation of the office, and it is the duty of the officer in whose office such bond is required to be filed at once to certify such failure to the appointing power, and the vacancy must be filled as in other cases. R. C. § 164. The officer with whom an official bond is required to be filed cannot file the same unless the approval of the proper officer is indorsed thereon. R. C. § 165. The approval of an official bond must be in writing indorsed thereon, and must show the time of approval, and be signed by the approving officer. R. C. § 158.

Under the statutes we have no doubt that, on the certificate of the secretary of state that a probate judge elect or appointed has failed to file an official bond, properly approved, within the time prescribed by law, it is the duty of the governor by appointment to fill the vacancy shown by the certificate to exist in the office. Such appointment being made, the appointee is entitled, when he shall have qualified according to law, to enter on the duties of the office, and no inquiry into the truth or falsity of the certificate can be made, except on *quo warranto*, or a proceeding in the nature of *quo warranto*. If this certificate had affirmed nothing more than the fact of the failure to file an official bond, and the consequent vacation of the office by the appellant, it would have been indisputable in this proceeding. That is not, however, its character. It recites the fact that the appellant had, within the time allowed by law, filed an official bond, which is appended, and rests the declaration of a failure to file such bond on the fact that, in the opinion of the attorney general, Judge

[Plowman v. Thornton.]

SAFFOLD, because of the expiration of his term of office, had no authority to approve it. It states the facts as they appeared from the files of the secretary's office, and submits to the governor, and the courts if the matter should be litigated, whether appellant had filed an official bond properly approved. We are not at liberty to reject as surplusage, or unauthorized, this recital of facts. It was eminently proper the secretary should have stated them, and not assumed to determine the question of law involved. It was proper also for the governor, in view of the opinion expressed by the law officer of the State, to make an appointment to fill the vacancy in the office, which, if that opinion is correct, certainly existed. If, however, Judge SAFFOLD's term of office had not expired when he approved the bond, the certificate destroys itself. So far from disclosing the failure of appellant to file an official bond, it discloses the fact that such bond was filed, properly approved, in the time prescribed by law. *Hartt* v. *Harvey*, 32 Barb. 55; *Ewing* v. *Thompson*, 43 Penn. 372.

3. The several acts of Congress, known as the "Reconstruction Acts," adopted respectively on the 2d March, 1867, the 23d March, 1867, and the 19th July, 1867, declared that no legal government existed in this State; that the government then in existence was to be deemed provisional merely, and if continued, was to be continued subject in all respects to the military commander of the district, and to the paramount authority of Congress. In order that a state government, capable of recognition by the federal government, should be formed, it was provided that to the registered voters should be submitted the election of delegates to a convention, for the purpose of "establishing a Constitution and civil government;" and at the same election the voters should determine whether such convention should be held. If a majority did not vote for such convention, it was not to be held. An election was had, and a majority having voted for a convention, it was held, and framed the present Constitution of the State. The convention was authorized and required to submit the Constitution for ratification to a vote of the registered voters. If a majority of them voted for its ratification, a copy of it was, by the president of the convention, to be transmitted to the President of the United States, who was required to transmit it to Congress. If it was approved by Congress, the State was to be declared entitled to representation in Congress. The Constitution was submitted to the registered voters for ratification; and an election for state and county officers, and for members of Congress, had at the same time, in February, 1868. On the 25th June, 1868, the State was by Congress admitted to representation, and the Constitution approved, on condition that the

legislature ratified the fourteenth amendment to the Constitution of the United States; and should further assent, that the Constitution should never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote, who were entitled to vote by the Constitution as it was then framed, except as a punishment for such crimes as were then felonies at common law, whereof they shall have been duly convicted under laws equally applicable to all the inhabitants of the State.   U. S. Stat. at Large, 15 vol. 73.

4. The manifest purpose of the Reconstruction Acts was the organization and establishment of a government in the State, in harmony with the prevailing policy of the general government, and which they could recognize as *republican in form*. The expediency of the acts, and their adaptation to this end, was never a judicial question; and their constitutionality has long since passed beyond the domain of judicial controversy and decision.   A Constitution was formed; a government organized and established, which the general government recognized; and to which for more than seven years the people have yielded obedience in all its departments, legislative, executive, and judicial.   A judge deriving his authority and jurisdiction from the Constitution formed under these laws cannot enter into an inquiry and discussion of their validity.

5. In determining the power and duty of the convention, which was on a vote of the registered voters to be held under these acts of Congress, we must bear in mind the purpose to be accomplished.   It was not only the formation of a Constitution, but the organization and establishment of a state government.   The convention was required to submit the Constitution it framed to the registered voters for ratification.   The mode of doing this was left to the convention.   The convention, having been called on a vote of the registered voters, assembled and framed a Constitution.   An ordinance was then adopted submitting the Constitution thus framed to the registered voters for ratification, and providing for an election at the same time of representatives in Congress, members of the general assembly, and state and county officers.   The ordinance further provided, that the officers elected at this election should hold office for the term prescribed by the Constitution, beginning from the day of the next general election after the admission of the State into the Union, and until the election and qualification of their successors.   Pamph. Acts 1868, p. 180, Ordinance, No. 32.   The ordinance makes provision for the election of a chief justice and two associate justices of the supreme court, chancellors, and circuit judges.   By the Constitution, judges of the supreme court are elected by the qualified electors of the State, and hold office for the term of

[*Plowman v. Thornton.*]

six years. At the election held under this ordinance in February, 1868, Judge SAFFOLD was elected associate justice of the supreme court. After the Congress had approved the Constitution, and admitted the State to representation, and after the general assembly had ratified the fourteenth amendment to the Constitution of the United States, he was qualified and entered on the discharge of his official duties, continuing therein until the qualification of his successor, on the 19th November, 1874. The first general election in the State after its admission into the Union, as it is expressed in the ordinance, or as expressed in the acts of Congress, after its admission to representation, was on the first Tuesday in November, 1868. The validity of the provision of the ordinance, so far as it declares that the official term of the officers elected under it should begin " from the day of the next general election after the admission of the State into the Union, and continue until their successors are elected and qualified," is denied; and it is insisted Judge SAFFOLD'S term of office begun and expired either six years from the day of his election in February, 1868, or from the day of his qualification in July, 1868. It is said the authority of the convention was special, and was limited to the formation of a Constitution; that the ordinance is legislative, beyond the power of the convention, and offends the provisions of the Constitution, by extending official terms beyond the term it prescribes. There would be more force in the proposition if a government had been in existence in the State — a government recognized by Congress *as " republican in form*, and capable of protecting life, liberty, and property " — a government with power to inaugurate its successor, and which could of itself have assembled a convention to form a Constitution, prescribed its powers, and reserved a revisory power over its action. Such a government the acts of Congress expressly declare was not existing. The government existing in the light of these acts was mere matter of fact, not of law, and was subject to the paramount authority of the military commander of the district, and to be changed, abolished, or superseded at the will of Congress. The military commander could under these acts, so far as he deemed necessary and proper, use its agencies to execute the powers with which he was intrusted. The displacement of this government, from which not only recognition was withheld, but which was shorn of all power except such as the military commander permitted it to exercise, by a government which the Congress would recognize, was the end proposed to be accomplished. A convention might assemble and form a Constitution, but the Constitution it ordained was without force, until it had received congressional approval. It was that approval alone which could

give it vitality and obligation.   When approved, the approval would not organize and put in operation the government the Constitution ordained.   Subsequent legislation by Congress, organizing and putting it in operation, is not contemplated.   The provisional government was declared not legal, existing merely as matter of fact, and was without capacity to organize and put in operation the legal government which was to displace it entirely.   On the convention therefore, in the very nature of things, it seems to us the duty of providing for the organization and establishment of the government the Constitution ordained devolved.   It could not devolve on the legislature, for none could assemble until the Constitution became operative, and when it did assemble, it would be without power so to arrange the terms of officers that an interregnum would not occur. The terms as fixed by the Constitution would be beyond their control.   It was impossible to foresee when Congress would admit the State to representation, or on what conditions, and, of consequence, when the constitutional term of office would begin and terminate.   Without this ordinance, the terms of officers, if commencing on the day of their election or qualification, and continuing only for the constitutional term, would have left the State without a judicial department from February or July, 1874, to the succeeding November, when a general election would be held.   If the official term had commenced, and been computed from the election in February, 1868, more than five months of the constitutional term would have elapsed, before the officers could have entered into and exercised the duties of their offices ; so that they would have been deprived of a part of the term of office assigned by the Constitution.   The ordinance was indispensable to the organization of the government, and to its successful operation, without intermission of its authority, after it had come into existence.   If it had been inserted in the body of the Constitution, its validity would not have been questioned.   It is temporary in its character and operation, and seems to us more properly the subject of an ordinance than of incorporation in the body of the Constitution, in which only permanent and enduring provisions should be found.   It cannot be regarded as in conflict with the constitutional provisions as to terms of office.   These provisions and the ordinance are to be construed together.   When thus construed they are harmonious, — the ordinance applying only to the officers elected under it, fixing their terms, and as to them qualifying the provisions of the Constitution, while the constitutional provisions are of full force as to officers subsequently elected.   The provisions of the ordinance, temporary in purpose and effect, — designed only to put in operation, and keep in operation without inter-

[Plowman v. Thornton.]

mission of official power the government the Constitution ordained, — finds a precedent in the history of nearly every constitutional convention. The object is sometimes accomplished by a schedule appended to the Constitution, and sometimes by an ordinance. The form is not material; the power of the convention to accomplish the object existing, much must be left to their discretion as to the form in which it will be accomplished.

We assent fully to the proposition that the power of the convention was special and limited, and that it had not legislative power. But within this special and limited power was embraced the power of adopting an ordinance putting in operation the governmental agencies which it established in the Constitution, and so organizing them that when the government came into existence, it would continue without an interregnum, or an intermission of officers and power, in all its departments. In the very words of the acts of Congress, the power of the convention was " establishing a Constitution and civil government." The ordinance continued Judge SAFFOLD's official term and authority until the election and qualification of his successor, which, not having occurred until the 19th November, 1874, he had authority to approve appellant's official bond. The certificate of the secretary of state disclosing the filing of the bond so approved, shows there was no vacancy in the office of probate judge to be filled by executive appointment. The appointment of appellee appears, therefore, to be void. It is not a *primâ facie* title to the office. It is without force for any purpose.

The order of the circuit judge must therefore be reversed and annulled, and a judgment here rendered dismissing the complaint at the costs of the appellee in this court, and before the circuit judge.

MANNING, J. — I concur in the conclusions announced by the chief justice, without expressing any opinion in respect to the legal obligation or constitutional validity of the acts of Congress known as " the Reconstruction Laws."

The government and Constitution which were thereby set up in this State have been recognized and obeyed as such for a period of seven years, and still are. The acts of those who were put in power under this Constitution in 1868, whether they were officers *de jure* or only officers *de facto* exercising a usurped authority, are legally effectual. This is required by the necessities of society. And I have no doubt that the ordinance of the convention adopted to put the government and Constitution referred to in operation, and extending the terms of those then put into office until their successors should be

qualified, is as valid as the Constitution framed by the same convention. According to this ordinance, Judge SAFFOLD continued to be in office as one of the judges of the supreme court to a day later than that on which he approved the bond of appellant as judge of probate for Talladega county. The bond, therefore, is not void.