# *Ex Parte* Birmingham & Atlantic Ry. Co.

*Prohibition to Restrain the Judge of the 7th Judicial Circuit from Hearing and Determining a Cause at Pell City, Ala.*

(DECIDED APRIL 28, 1905, 42 So. REP. 118.)

1. *Constitutional Law; Constitutional Convention; Powers; Passage of Ordinance.*—The Constitutional Convention assembled by virtue of the act convening the same (Acts 1900-01, p. 224) had no authority to enact an ordinance providing for an additional courthouse in certain counties.

2. *Same; Ratification.*—Although the Constitutional Convention was without authority to enact an ordinance providing for courthouses in certain counties, yet if such ordinance be ratified by a vote of the people, it may become valid.

3. *Same Submission to Vote.*—The act providing for the holding of the Constitutional Convention also provided for an election by the people for the purpose of ratifying or rejecting the constitution promulgated by said convention. The constitutional convention also provided that the instrument promulgated by it should be submitted to the electors for ratification or rejection. The constitution was submitted to a vote of the people for ratification or rejection, but the ordinance providing a court house at Pell City, in St. Clair county, Ala., was not in-

cluded in the submission and was not voted upon by the people. Held, the vote for the ratification of the constitution by the electors was not a ratification of the ordinance.

4. *Statutes; Local Laws; Notice.*—Under § 106, Constitution of 1901, the Acts providing for an additional court house in the counties of St. Clair and Shelby being local laws, are invalid because notice of intention to apply for the passage of said acts was not given as required by said section.

5. *Same; Terms of Court.*—A local law fixing the time of holding courts in the county is not rendered invalid through want of notice of intention to apply therefor under the express provision of § 106, Constitution 1901.

Original writ in Supreme Court.

Prohibition, on behalf of the Birmingham & Atlantic Railway Company, to restrain Hon. John Pelham, individually and as judge of the seventh judicial circuit, from hearing and determining a cause pending in the circuit court of St. Clair county, wherein one Spears was plaintiff and petitioner was defendant.

The allegations are that Spears brought suit against the petitioner at Pell City, in St. Clair county, in the circuit court, that the same was set down for hearing on a certain day, and that witnesses had been summoned, etc.; that petitioner had protested to the said judge of the seventh judicial circuit against said cause being set down for trial, and had requested him to notify his clerk at Pell City to remove said cause from the docket and not to summon witnesses, etc. Petitioner avers that Pelham claims to have authority to hold said court at Pell City and to try said cause, and that, unless restrained from doing so, he would proceed and try the same. It is alleged that he claims his authority under and by virtue of ordinance No. 390, passed by the constitutional convention of the state of Alabama, Const. 1901, and by virtue of an act of the Legislature approved February 17, 1903 (Loc. Acts 1903, pp. 29-32, inclusive), and under and by virtue of the authority of an act approved October 6, 1903 (Loc. Acts 1903, p. 539). It is averred that such judge has no other authority, and claims no other authority, than that conferred by said ordinance and said acts as above set out. It is also averred that said ordinance does not confer any authority or warrant of law

upon the said judge to hold said term of court at such time and place, for the following separate and several reasons: (a) Said constitutional convention, in the call thereof made by the Legislature, was required to submit all of its acts to the people of the state of Alabama for ratification, and petitioner avers that said ordinance was never submitted to the people of Alabama for their ratification, and that on such account the same has never become operative and is of no force. (b) Said constitutional convention, in attempting to pass such ordinance, was legislating in regard to local matters, and said convention had no authority to enact such local legislation, and on this account said ordinance is void and of no effect. (c) Said ordinance was passed by the said constitutional convention of 1901, but was not included in such constitution as submitted to and ratified by the people. (d) Said ordinance is not included in, nor is it a portion of, the constitution of 1901. For which separate and several reasons said ordinance is unconstitutional and void, and does not confer the authority sought to be exercised by the said Hon. John Pelham, or any other judge, to hold such court at such a legal time and place. It is further averred that if said ordinance No. 390 is valid and of full force and effect, which petitioner denies, the said Pelham is without authority or warrant of law to hold said court at such a legal time and place, in that no provision has ever been made for carrying such ordinance into effect and providing for holding courts at Pell City, Ala., except that certain act of the Legislature contained in Loc. Acts 1903, p. 28. It is averred that said act of the Legislature is unconstitutional and void for the following reasons: (a) It is unconstitutional and without warrant of law. (b) It is unconstitutional, in that it is a local act as defined by section 110 of the constitution of Alabama of 1901, and no notice of the intention to apply for such local legislation was published in the county where the matter or thing to be affected was situated, giving the substance of the proposed law, and no proof thereof by affidavit was given that said notice was made and exhibited in the houses of the Legislature and spread on the journals of both of such houses. Other allegations of a similar nature are

made. It is further averred that to the certain other act of the Legislature above referred to (Loc. Acts 1903, p. 539) is unconstitutional for similar reasons. Respondent answered, admitting the truth of some of the allegations, but denying that ordinance No. 390 was void and of no effect, and also denying the unconstitutionality of the act referred to in the petition. The ordinance is made an exhibit to the petition and will be found in the journal of the proceedings of the constitutional convention of 1901. It is admitted that this ordinance was not submitted to and ratified by the people of the state of Alabama at the election held for the purpose of ratifying the constitution adopted by the constitutional convention of 1901. The other facts sufficiently appear in the opinion.

KNOX, DIXON & BURR, for petition.—A writ of prohibition is proper remedy where a judge is holding court established by a void and unconstitutional law.—Ex *parte Roundtree,* 51 Ala. 42; *Lancaster v. Gafford,* 139 Ala. 373; *Ex parte Branch,* 63 Ala. 383; Enc. of P. & P. Vol. 16, page 1122.

When the act from which a constitutional convention derives its powers provides for the submission of the convention's work to the people, it must be so submitted and only becomes operative upon the approval of the electors.—6th Am. & Eng. Enc. of Law, 2d. Ed. pp. 896-898; Jameson on Constitutional Conventions, pages 425, 426, 414, 424, 493, 98; Cooley's Constitutional Limitation, 7 Ed. pg. 61; *McDanield's case,* 2d. Hill (S. C.) page 2701; *Quinlan v. Houston,* 34 SW. Reports 738; *Wells v. Bain,* 15 Am. Reports, 563; *Wood's Appeal,* 75 Pa. St. 59; *Goodrich v. Moore,* 72 Am. Decision, pg. 78 (note) ; 8 Cyc., page 723.

A constitutional convention has no authority to enact and pass local legislation.—*Plowman v. Thornton,* 52 Ala. 569; *Authorities supra.*

The provisions of the ordinance passed by the constitutional convention requiring the Legislature to enact certain laws is directory only—not mandatory.—*Ex parte State,* 52 Ala. 237; Cooley's Constitutional Limita-

tions (7th Ed.) 119; 6th Am. & Eng. Enc. of Law, (2d Ed.) p. 917.

INZER & MONTGOMERY, M. M. SMITH, and McLANE TILTON, JR., for respondent. CABANISS & WEAKLEY associated on rehearing.—The power of a constitutional convention to legislate is well established. The constitutional convention of 1865 passed many ordinances legislative in their character similar to the one under consideration, and its authority to do so was upheld in the following cases.—*Dorman v. The State*, 34 Ala. 216; *Tarlton v. Southern Bank*, 41 Ala. 722; *Kirkland v. Moulton*, 41 Ala. 548; *Scheible v. Banco*, 41 Ala. 423; *Washington v. Washington*, 69 Ala. 281, which in effect overrules the dictum in *Plowman v. Thornton*, 52 Ala. 559; *Ferdinand v. The State*, 39 Ala. 706; *Jeffries v. The State*, 39 Ala. 655; *Aaron v. The State*, 39 Ala. 648. The constitutional convention of 1867 adopted ordinances similar to the one under consideration, legislative in their character and these ordinances have been upheld.—*Jones v. Jones*, 95 Ala. 443; *Crane v. McGinnis*, 19 Am. Dec. 237; *Powell v. Boone*, 43 Ala. 459; *McElwain v. Mudd*, 44 Ala. 48; *Ex parte Hall*, 47 Ala. 675; *Crump v. Battle*, 49 Ala. 233; *Balkrum v. Satcher*, 51 Ala. 81; *Watson v. Stone*, 52 Ala. 150; *Pearce v. Pope*, 42 Ala. 319. Other cases in which the legislative ordinances of 1867 were cited, construed and applied are the following.—*Stikes v. Swanson*, 44 Ala. 655; *Bibb v. County Commissioners*, 44 Ala. 119; *Coleman v. Hodges*, 44 Ala. 124; *Roach v. Gunter*, 44 Ala. 209; *Hale v. Huston*, 44 Ala. 135; *Lawson v. Miller*, 44 Ala. 617 (p. 626); *Ex parte Norton*, 44 Ala. 177 (pp. 186-7); *Moseley v. Tuthill*, 45 Ala. 621 (p. 655); *Griffin v. Ryland*, 45 Ala. 688.

The act calling the constitutional convention, did not require this ordinance to be submitted to the people. This question is no longer a judicial one. The legislature has recognized its binding force in the several local laws passed to effectuate and put in operation the provisions of this ordinance.—*Taylor v. Commonwealth*, (Va.), 44 S E. 754; *Secomb v. Kettelson*, 29 Minn. 55; *State v. Piper*, 17 Neb. 614; *Miller v. Johnson*, 92 Ky. 589; *Wood's Appeal*, 75 Pa. St. 59.

ANDERSON, J.—The issue in this case involves the validity of Ordinance No. 390 of the constitutional convention, providing for an additional court house in the counties of St. Clair and Shelby, respectively, as well as Local Acts 1903, pp. 28 and 539. The constitutional convention assembled under and by virtue of the act of the Legislature of 1901 (Acts 1900-01, p. 224) entitled "An act to provide for the holding of a convention, to revise and amend the Constitution of the State." Section 22 of said act provides for the holding of an election for the ratification or rejection of the Constituoin. The ordinance in question pertains is no way to an amendment or revision of the Constitution, and it was beyond the power of the convention to pass this ordinance, and it could not become binding or of legal force without having been submitted to and ratified by the people.— *Plowman v. Thornton,* 52 Ala. 559; 6 Am. & Eng. Ency. Law (2d Ed.) pp. 896-898; Jameson on Constitutional Conventions, pp. 98, 414, 424, 426 and 493; Cooley's Constitutional Limitations (7th Ed.) p. 61; *McDaniel's Case,* 2 Hill, Law (S. C.) 270; *Quinlan v. Houston,* (Tex. Sup.) 34 S. W. 738; *Wells v. Bain,* 15 Am. Rep. 563; Wood's Appeal, 75 Pa. 59; *Goodrich v. Moore,* (Minn.) 72 Am. Dec. 78; 8 Cyc. p. 723, note.

Jameson, in his work on Constitutional Convention, says: "Now, in the light of these principles, is the exercise by a convention of legislative or other governmental powers, in addition to those clearly belonging to it, to be considered as within its competence as a constitutional body? Is such an assumption of power one which threatens no danger to the commonwealth? By the theory of those who accord to its such powers, as soon as the convention is assembled, the control of the existing government over it is at an end; the Constitution lies torn in fragments under its feet; and, while the work of its instauration is in progress, that body alone constitutes the state, gathered into its single hands the reins ordinarily held by the four great systems of agencies constituting the government, to whose functions it succeeds. If this be so, what, but its own sense of justice, is to restrain such a body from running riot, as did the Thirty Tyrants at Athens? The jurists of the Illinois

convention of 1862, as we have seen, affirmed that the act under which such a body assembles is no longer binding when once it has become organized. If at that moment it has also cast upon it, by virtue of its great commission, all governmental powers, how easy to extend the scope and the period of the exercise of those powers, under the plea that expediency demands it. The expedient is the appropriate domain of a Legislature. If, at the moment of organizing, a convention is endowed with legislative powers, it may be deemed expedient to subvert the system of guaranties by which our liberties are assured to us, and at the same time to withhold from the popular vote the constitutional provisions by which the change is to be effected. Such a consummation would be not merely possible. It would be probable. And, clearly, the possibility of its occurring with an appearance of rightfulness is enough to stamp as dangerous that theory of conventional powers from which it must flow. In the science of politics, it is an important point gained to have settled the limit where normal action under the Constitution ends, and revolution begins. To have done that is practically, in most cases, to have rendered revolution impossible. The result is that a convention cannot assume legislative powers. The safety of the people, which is the supreme law, forbids it. Even if we suppose the body expressly empowered by the Legislature to exercise such powers, the right so to do must be denied, because the same supreme law places an absolute interdict on such a grant. It is beyond the power of a Legislature to delegate any such authority."

We quote from the Supreme Court of Pennsylvania (*Wood's Appeal*, 75 Pa. 59) : "There is no subject more momentous or deeply interesting to the people of this state than an assumption of absolute power by their servants. The claim of a mere body of deputies to exercise all their sovereignty, absolutely, instantly, and without ratification, is so full of peril to a free people, living under their own instituted government and a well matured Bill of Rights, the bulwark and security of their liberties, that they will pause before they will allow the

claim, and inquire how they delegated this fearful power
and how they are thus absolutely bound and can be con-
trolled by persons appointed to a special service. Struck
by the dangers, and prompted by self-interest, they will
at once distinguish between their own rights and the
powers they commit to others. These rights it is the ju-
diciary is called on to maintain. The very rights of the
people and freedom itself demand, therefore, that no
such absolute power shall be imputed to the mere dele-
gates of the people to perform the special service of
amendment, unless it is clearly expressed, or as clearly
implied, in the manner shown by the people to communi-
cate their authority. A convention has no inherent
rights. It exercises powers only. Delegated power de-
fines itself. To be delegated, it must come in some
adopted manner to convey it by some defined means.
This adopted manner, therefore, becomes the measure of
the power conferred. The right of the people is abo-
lute, in the language of the Bill of Rights, 'to alter, re-
form or abolish their government in such manner as they
may think proper.' This right being theirs, they may
impart as much or as little of it as they shall deem ex-
pedient. It is only when they exercise this right, and
not before, they determine by the mode they choose to
adopt the extent of the powers they intend to delegate.
Hence the argument which imputes sovereignty to a
convention, because of the reservation in the Bill of
Rights, is utterly illogical and unsound. The Bill of
Rights is a reservation of rights out of the general pow-
ers of government to themselves, but is no delegation of
powers to a convention. It defines no manner or mode
in which the people shall proceed to exercise their rights,
but leaves that to their after choice. Until then it is
unknown how they will proceed, or what powers they
will confer on their delegates. Hence, we must look be-
yond the bill of rights, to the mode adopted by the peo-
ple, to find the extent of the power they intend to dele-
gate. These modes were stated and discussed in the
opinion of *Wells, et al. v. Bain, et al., supra*. If by a
mere determination of the people to call a convention,
whether it be by vote or otherwise, the entire sovereignty

of the people passes *ipso facto* into a body of deputies or attorneys, so that these deputies can, without ratification, alter a government and abolish its Bill of Rights at pleasure, and impose at will a new government upon the people, without restraints upon the governing power, no true liberty remains. Then the servants sit above their masters by the merest imputation, and a people's welfare must always rest upon the transient circumstances of the hour, which produce the convention and the accidental character of the majority which controls it. Such a doctrine, however suited to revolutionary times, when new governments must be formed as best the people can, is wholly unfitted when applied to a state of peace and to an existing government instituted by the people themselves and guarded by a well matured Bill of Rights. The people have the same right to limit the powers of their delegates that they have to bound the power of their representatives. Each are representatives, but only in a different sphere. It is simply evasive to affirm that the Legislature cannot limit the rights of the people to alter or reform their government. Certainly it cannot. The question is not upon the power of the Legislature to restrain the people, but the right of the people, by the instrumentality of the law, to limit their delegates. Law is the highest form of a people's will in a state of peaceful government. When the people act through a law, the act is theirs; and the fact that they used the Legislature as their instrument to confer the powers makes them the superiors, and not the Legislature. The idea which lies at the root of the policy that a convention cannot be controlled by law is that the convention and the people are identical. But, when the question is to be determined between the people and the convention, the fallacy is obvious. Such a metonymy may do for a flourish of rhetoric, but not for grave argument. The parties to the question are the people on the one hand and the convention on the other. The people allege a usurpation of power in this: That the convention seeks to bind them without their ratification. The question then is, what power was conferred? The judiciary sits to decide between them. The

people having challenged their power to set a government over them at will, the agents must show their authority to do this. The latter put in evidence the act of 1871 as their authority. Then the issue is, does the act of 1871, simply ordering a convention to be called, confer this absolute, extraordinary, and dangerous power upon a ·body of men not yet called into being, and which can have neither being nor power except by the further act of the people through the instrumentality of a law? To make the law odious, it is assumed that the Legislature is or may be corrupt. But this is aside from the true question of power. In a governmental and proper sense, law is the highest act of a people's sovereignty, while their government and Constitution remain unchanged. It is, the supreme will of the people, expressed in ˙the forms and by the authority of their Constitution. It is their own appointed mode through which they govern themselves and by which they bind themselves. So long as their form of government is unchanged in its grant of all legislative powers, these laws are supreme over all subjects unforbidden by the instrument itself. The calling of a convention and regulating its action by law is not forbidden in the Constitution. It is a conceded manner through which the people exercise the rights reserved in the Bill of Rights. It falls, therefore, within the protection of the Bill of Rights as a very manner in which the people may proceed to amend their Constitution and delegate the only powers they intend to confer, and as the very means whereby they may, by limitation, defend themselves against those who are called in to exercise the powers. The Legislature may not confer powers by law inconsistent with the rights, safety, and liberties of the people, because no consent to do this can be implied; but they may pass limitations in favor of the essential rights, safety, and liberties of the people, because consent to do this can be implied; but they may pass limitations in favor of the essential rights of the people. The right of the people to restrain their delegates by law cannot be denied, unless the power to call

a convention by law and the right of self-protection be also denied. It is, therefore, the right of the people, and not the Legislature, to be put by law above the convention, and to require the delegates to submit their work for ratification or disapproval. To argue a want of authority in the law from the alleged character of those who passed it is bad logic and an undeserved reproach, in view of the subsequent act of 1872, which opened a wide door to men of all parties and filled the convention with the best men in the State. When it is conceded that a convention can be called and organized by law, the number or the qualifications of the delegates prescribed, their districts defined, their mode of selection or appointment determined, their time and place of meeting fixed, and their compensation declared by law, the binding force of law must be conceded. The convention was a creation of law, and its members the offspring of law—by the mere force of law,—without a popular election. How, then, can the power of law be denied? Without it, no delegates had existed, and no power had been transmitted to them. It is a solecism and a fallacy to assert that a law has the power to transmit the authority of the people, and yet it is a nulliy in the terms of its transmission. If the authority of the people passes to the convention outside of the law, the people are left without the means of self-protection, except by revolution. Then the singular spectacle is presented of the absolute sovereignty of the people being vested in a body of agents without any known means of transmission or limitation. But, clearly, this cannot be when the fundamental rights of the people are at stake. To estop them from their right to accept or reject the work of the convention, there must be an evident channel pointed out through which their power passed to the convention to ordain at pleasure a Constitution or binding ordinance. The force of the argument cannot be avoided by reference to the well-known purity of character of the delegates. The personnel of the convention has nothing to do with the question of delegated power. It may help to suppress an inquiry into the power; but, however presently popular the doctrine of self-imputed

sovereignty may be to those whose integrity forbids intentional wrong, as a question of power the doctrine is unfounded in principle, repugnant to right reason, incompatible with safety, dangerous to liberty and unsuited to times of agitation and excitement which sometimes overcome the people. No argument for the implied power of absolute sovereignty in a convention can be drawn from revolutionary times, when necessity begets a new government. Governments thus accepted and ratified by silent submission afford no precedents for the power of a convention in time of profound tranquility and for a people living under self-established safe institutions. Then, looking at the body to which this power may be imputed: The number may be any designated in the law—133, 33, or 3 times 3. The delegates may not be chosen by the whole people as under the act of 1872. On what principle of sound mind or logical deduction does such a body possess, by mere imputation, all the powers of the people not conferred on them by law? They possess them by no act of the people independently of law. And certainly there is no popular afflatus outside of the law to breathe into them the spirit of prophecy in the name of the people. In conclusion, we find nothing in the Bill of Rights, in the vote under the act of 1871, or the authority conferred in the act of 1872, nothing in the nature of delegated power, or in the constitution of the convention itself, which can justify an assumption that a convention, so called, constituted, organized, and limited, can take from the people their sovereign right to ratify or reject a Constitution or ordinance framed by it, or can infuse present life and vigor into its work before its adoption by the people."

In *McDaniel's Case*, 2 Hill, Law, 270, the Supreme Court of South Carolina said: "The sole difficulty seems to me to have arisen from confounding together the authority attributed by the convention to the people, and with that of the convention. Certainly the convention was not the people for any other purpose than that for which the people elected and delegated them. An argument was

drawn from the supposed absurdity of the Legislature, an inferior authority, putting limits to the power of its superior and creator. But I think it is not a correct stating of the question. The question is the authority of the convention. An ordinance is produced to us passed by a certain number of individuals assembled at Columbia. This gives it no authority as an act of the people. But we are told they were elected by the people. This, however, is not enough. To what purpose were they elected by the people? To represent their sovereignty. But was it to represent their sovereignty to every purpose, or was it for some specific purpose? To this no other answer can be given than the act of the Legislature under which the convention was assembled. Certainly the people may, if they will, elect delegates for a particular purpose, without conferring on them all their authority. To deny this would be to detract from the power of the people, and to impose on them a most inconvenient and dangerous disability. If, before the adoption of the present Constitution, the people, electing delegates in their primary capacity, had, by a majority of their ballots, specified a particular measure to be considered and decided in the convention, will it be pretended that the convention would have possessed authority for any other purpose? But the Legislature, in passing the act for calling together the convention, were not acting in their legislative capacity. The act has no relation to general powers of legislation. They were the agent of the people for this particular purpose, and instructed by the convention to speak their voice. But, suppose there had been no such provision in the Constitution, and the Legislature had passed an act recommending to the people to meet in convention for a specific purpose, and in its pursuance of the recommendation the people had elected delegates accordingly, what right or reason would I have to conclude that the people intended to intrust this convention with their authority for any other than the purpose specified? This would be plain usurpation of the power of the people."

Judge Cooley, in his work on Constitutional Limitations (7th Ed., p. 61, § 4), says: "In accordance with

universal practice, and from the very necessity of the case, amendments to an existing Constitution, or entire revision of it, must be prepared and matured by some body of representatives chosen for the purpose. It is obviously impossible for the whole people to meet, prepare, and discuss the proposed alterations, and there seems to be no feasible mode by which an expression of their will can be obtained, except by asking it upon the single point of assent or disapproval. But no body of representatives, unless specially clothed with power for that purpose by the people when choosing them, can rightfully make definite action upon amendments or revisions. They must submit the result of their deliberations to the people—who alone are law—for ratification or rejection. The constitutional convention is the representative of sovereignty only in a very qualified sense, and for the specific purpose and with the restricted authority to put in proper form the questions of amendment upon which the people are to pass; but the changes in the fundamental law of the state must be enacted by the people themselves."

The supreme court judges of Massachusetts, in 6 Cush. 574, 575, in discussing this question, said: "Upon the first question, considering that the constitution has vested no authority in the Legislature, in its ordinary action, to provide by law for the submitting to the people the expediency of calling a convention of delegates for the purpose of revising or altering the constitution of the commonwealth, it is difficult to give an opinion upon the question, what would be the power of such a convention, if called? If, however, the people should, by the terms of their votes, decide to call a convention of delegates to consider the expediency of altering the constitution in some particular part thereof, we are of opinion that such delegates would derive their whole authority and commission from such vote; and upon the general principles governing the delegation of power and authority they would have no right, under such vote, to act upon and propose amendments in other parts of the constitution not so specified."

[*Ex parte* Birmingham & Atlantic Railway Co.]

The supreme court of Arkansas in *Bragg v. Tuffts,* 49 Ark. 560, 561, 6 S. W. 160, said: "The first question that suggests itself is, what right had the convention—a body consisting of but a single chamber—to enter upon the domain of general legislation? For the raising of revenue, the providing of ways and means to meet the expenses of administering the government, and the prescribing of the funds in which taxes are to be paid, are legislative functions, not of a fundamental character. But by the constitution of 1836, and by all other constitutions that have ever been in force in this state, the legislative power has been confided to a General Assembly, consisting of a senate and house of representatives. The Governor also has always had a voice in legislation—a limited power of vetoing measures which did not meet with his approval. Now a convention called, for instance, to frame a new constitution, has no inherent right to legislate about matters of detail. All of the powers that it possesses are such as have been delegated to it, either by express grant or necessary implication. The passage of an ordinance, then, to raise revenue, was an assumption of power by the convention that was never ratified by the people of the state; for it is a noteworthy fact that the convention of 1861 never submitted any of its work to the test of a popular vote—neither its ordinance of secession, nor the constitution which it promulgated on the 1st of June, 1861"—citing the *Wood case, supra,* and Jameson on Constitutional Conventions, p. 419.

It is contended that, if the adoption of the ordinance was beyond the authority of the convention, it is nevertheless valid and binding, because the constitution was submitted to and was ratified by the people. The authorities are almost uniform that the ratification of an unauthorized act by the people (and the people are the principal in this instance) renders the act valid and binding. We cannot assume, however, that this ordinance has been ratified. It is true the convention provided that the ordinance should become a law only upon a ratification of the constitution, and that the constitution was ratified. But can it be contended that such a

condition secured a ratification of the ordinance, simply because the constitution was submitted and ratified, and which did not contain the ordinance, nor was it annexed thereto?　The act formulating a call of the convention, and which was voted on by the people, provided only for "amending and revising" the constitution, and section 22 also required that the instrument framed should be submitted to the people for ratification or rejection.　The people, therefore, in voting for the holding of a convention, not only limited the powers of the convention to the amendment and revision of the constitution of 1875, but required that its action be submitted back to them.　The convention, realizing the requirements placed thereon by the powers calling it into existence, provided by paragraph 4 of section 287 that the constitution be submitted to the electors of the state for ratification or rejection, but no provision was made for a submission of the ordinance in question.　Paragraph 5 of section 287 directed the Governor to take such steps as would give general publicity and circulation to the constitution prior to the election for ratification or rejection.　The governor, pursuant to said direction, had printed in pamphlet form and circulated all over the state the constitution, but which failed to contain the ordinance in question.　The governor also issued a proclamation appointing the day for the holding of an election for the adoption or ratification of the constitution, and nothing was said in the proclamation as to the ordinance.　Every step that was taken, either by the convention or the governor, relating to the election for ratification, had reference only to the constitution, and not to ordinances that had been adopted by the convention.　Nothing whatever was done to put the electors of Alabama on notice that they were to vote for the ratification of anything but the constitution as framed and as contained in the phamphlets that were put in circulation.　We cannot hold that this ordinance has ever been ratified.

We have examined the authorities relied upon by counsel for the respondent, but find them no great impediment in reaching the foregoing conclusion, which is fortified by a great weight of authority.　What was said as

34

to the validity of the ordinance was dictum in the case of *Ex parte Hall*, 47 Ala. 675. The Illinois case did not decide this point, but the ordinance fell because the public failed to ratify the constitution. In the case of *State v. Keith*, 63 N. C. 140, this point was not touched, as the ordinance fell because it was *ex post facto*. In the case of *State v. Neal*, 42 Mo. 119, what was said was dictum as to this point, and which we consider unsound. In the case of *Stewart v. Crosby*, 15 Tex. 546, the ordinance was upheld because it was appended to the constitution as a part of the fundamental law of the land and was adopted by the people along with the constitution. Besides, the supreme court of Texas, in the case of *Quinlan v. H. & T. C. Ry. Co.*, 89 Tex. 376-377, 34 S. W. 738, in commenting on the *Crosby case, supra*, says: "We are of opinion, however, that the ordinance was not valid. The convention which met on June 1, 1868, was assembled in pursuance of an act of congress passed March 23, 1867. It was called for the purpose of framing a constitution for the state, with a view to its restoration to the Union. The constitution to be framed by it was to be submitted for ratification to a vote of the people. See Act. Cong. March 23, 1867, §§ 3, 4, 15 Stat. 2; 2 Pasch. Dig. p. 1093. The act of Congress did not invest the convention with the power of independent legislation. It is true that the question of the propriety of incorporating any specific provision into the fundamental law was for the sole determination of the convention. But we are of opinion that, when a convention is called to frame a constitution which is to be submitted to a popular vote for adoption, it cannot pass ordinances and give them validity without submitting them to the people for ratification as a part of the constitution. The delegates to such a convention are but agents of the people, and are restricted to the exercise of the powers conferred upon them by the law which authorizes their election and assemblage. The ordinance of the convention in question, which divided the state into congressional districts, and that which provided for a submisson of the proposed constitution to a vote of the people, are appended to the constitution as framed, and the whole are

signed by the president and members as one instrument. 2 Pasch. Dig. pp. 1134, 1135. Section 1 of the latter ordinance contains the provision 'that the constitution adopted by this convention be submitted for ratification or rejection to the voters of this state,' etc. There is no provision for a submission of the independent ordinances. In *Stewart v. Crosby*, 15 Tex. 546, an ordinance attached to the constitution of 1845 was held valid. In that case the court say: 'For the present, then, it may suffice to say we think it free from doubt that the ordinance appended to the constitution is a part of the fundamental law of the land. Having been framed by the convention that framed the constitution of the state, and adopted by the convention and the people along with the constitution, it is of equal authority and binding force upon the executive, legislative, and judicial departments of the government of the state as if it had been incorporated in the constitution, forming a component part of it.' This decision was followed without comment in *Grigsby v. Peak*, 57 Tex. 142, in passing upon the validity of an ordinance of the convention of 1866. From what has been quoted from the opinion in *Stewart v. Crosby, supra*, it appears that the ordinance then in question was submitted with the constitution and voted upon by the people. The convention which passed the ordinance which was held valid in *Grigsby v. Peak* was called by virtue of the proclamation of President Johnson. This proclamation did not require any part of the works of the convention to be submitted to the vote of the people, and in our opinion that convention, therefore, had the power to pass ordinances without submitting them for adoption to a popular vote. The ordinance now under consideration was not submitted to a vote, though two others, which were added to, incorporated into, and signed as a part of the constitution, were so submitted. Since the convention could not finally legislate, and since a vote of the people was necessary to make its action effective, we conclude that the ordinance in question was invalid and not effective for any purpose."

The ordinance in the case of *Plowman v. Thornton*, 52 Ala. 567, was upheld on the theory that it was essen-

tial to maintain the system of government until the officers elected under the new constitution could assume control. It was deemed legislation, which was condemned by Judge BRICKELL, who declared that the convention had no "legislative power." In the case of *Washington v. Washington*, 69 Ala. 281, the ordinance of 1865 legalizing the marriage of former slaves was upheld, notwithstanding the fact that it was not made a part of the constitution and was not ratified by the people. This ordinance, however, was adopted by a convention assembled pursuant to a proclamation of the President of the United States, issued at a time when Alabama had no recognized civil government, and to enable the "loyal people of the state to enact a Constitution to restore the state to its constitutional relationship to the federal government." The convention so assembled had to deal with new conditions, wrought by the termination of a long and bloody Civil War, which resulted in freeing from slavery nearly one-half of the people of the state. The exigencies of the times required prompt and immdiate action in dealing with them, and the speedy enactment of laws to meet the changed conditions of our citizenship. Besides, the proclamation of the president calling the convention into existence extended to it "all the powers necessary and proper" to enable the loyal people of the state to formulate a plan of government that would meet said changed conditions, and at the same time restore our relationship to the federal government. The authorities generally except ordinances, and even Constitutions, enacted in time of war, or upon the heels thereof, from the more rigid rule as applicable to those adopted in time of peace and tranquility.

The ordinance locating this additional courthouse being void, Acts 1903, p. 28, to carry into effect the provisions thereof, being local, and not confined in its purpose solely to fixing the time for the holding of courts, is repugnant to section 106 of the Constitution, because no notice was given of the intention to apply therefor, and must go down with the ordinance. Acts 1903, p. 539, having for its sole purpose the fixing of the time of holding court in the Seventh circuit, while a local law, is ex-

pressly excluded from section 106 of the Constitution of 1901 as to giving notice before the passage thereof, and is therefore valid. Since the ordinance and act fixing the courthouse at Pell City are void, the last-mentioned act is inoperative, so far as it provides the time for holding court at that place, but to all other intents and purposes is valid and binding.

It is doubtless true that the county has expended a large sum for a courthouse and jail, and that a failure to hold a term of court at Pell City may put many of the people to no little inconvenience. These facts should be considered by the Legislature, which is the only department of the government with authority to establish two courthouses in one county, and then only after complying with the constitutional provisions. Considerations of need and expediency should not and will not deter the courts of the land from annulling an ordinance that is so illegal and unwarranted, and the upholding of which would establish a precedent revolutionary in its character, and which would be a menace to coming generations in the enjoyment of rights guaranteed under a republican form of government.

The relief sought is granted, and the writ is made peremptory.

McCLELLAN, C. J., and HARALSON, SIMPSON, and DENSON, JJ., concur. TYSON and DOWDELL, JJ., dissent.

## ON REHEARING.

ANDERSON, J.—We do not desire to prolong to a great extent a discussion of this question, as we think the conclusion heretofore reached by a majority of the court is not only sustained by a great weight of authority, but is the only safe and logical adjudication of this most important question; and we will reply as briefly as possible to the argument of counsel for a rehearing. All political power is inherent in the people, and all free governments are founded on their authority and instituted for their benefit. Section 2, Art. 1, of the Declaration of Rights (Const. 1901). A convention has delegated, and not inherent, rights. The authority dele-

gated to the convention of 1901 was the power to revise and amend the constitution of 1875. The convention, therefore, had no right to exercise the authority of the Legislature and adopt the ordinance in question, which was local legislation, pure and simple; and, the adoption of said ordinance being unauthorized, it could not become binding unless ratified by the people.

Counsel cite authorities not cited upon the original hearing and not discussed in the oponion, contending that they justify the claim that the convention of 1901 had the power to legislate. Many of these authorities relate to ordinances that met with the same fate as the one in the case of *State v. Keith,* 63 N. C. 140, and which fell by the wayside before it became necessary to determine the authority of the convention. Some of them, however, recognized the authority of the convention to adopt ordinances, but all of which seem to have been general in operation, and not local, as is the one in question. These authorities are in conflict with the expression of Judge BRICKELL in the *Plowman Case,* 52 Ala. 567, because said expression referred to the power of the convention of 1867, but are not necessarily in conflict with the opinion in this case. For, while we do not hold that the conventions of 1865 and 1867 had the authority to legislate, we do think that they were held at a time and under conditions that would excuse a thing done by them, which should not be tolerated if done by the convention of 1901, when conditions were normal and our government had become stable and conservative—when we had a government by the people, free from the control of federal authority, and were not influenced or dominated by a standing army. We have discussed the exigencies of the times, which doubtless justified the ordinance of 1865, especially the one that was upheld in the *Washington Case,* 69 Ala. 281, and we think the convention of 1867 was held at a time and under conditions less calculated to make it a test or guidance to subsequent conventions than the former. While a political and not a judicial question, it is a matter of history and common knowledge that the Constitution framed by the convention of 1867 was rejected by the people, but was

nevertheless adopted by Congress. Report of Secretary of War, Nov. 20, 1868; Maj. Gen. Mead's Report, Oct. 31, 1868.

As is contended by counsel, there has been some "wobbling" by this court in reference to the ordinances of 1865 and 1867; but Justice Brickell sounded the note of warning in the *Plowman Case,* which was heeded by the Legislature in passing the act of 1874 calling the convention of 1875, which said convention framed the organic laws under which we lived for more than a quarter of a century, and followed not in the footsteps of the conventions of 1865 and 1867. We thoroughly agree with counsel for respondent that the "act of 1901 did not require Ordinance No. 390 to be submitted to the people." The act so clearly defined the purpose for which the convention should be held that we have every reason to conclude that the Legislature did not, for a moment, anticipate that the convention would undertake to indulge in local legislation relating to Shelby and St. Clair counties. Much of the brief is devoted to a criticism of some of the authorities cited in support of the conclusion reached in the original opinion, and Mr. Jameson comes in for a full share. While we think the law as set out by Mr. Jameson on this subject is sound, we are not indebted to him solely for enlightenment on the subject. Mr. Jameson was guided by the Supreme Court of South Carolina, and by the judges of the Supreme Court of Massachusetts, who had considered the question years before his work was written and published, and this doctrine was subsequently enunciated by the Supreme Courts of Pennsylvania, Texas, and Arkansas. It is true that Mr. Jameson was criticised by the German writer, Prof. Von Holst, but which Mr. Jameson himself answered most effectively. We are not called upon in this case to express a preference between these two men, as this question has been adjudicated by the courts of the land. But, were conditions such that we had to be guided exclusively by the views of the one or the other, we would unhesitatingly accept the tutelage of Mr. Jameson. He was a lawyer of distinction, a judge of the superior court of Chicago, a citizen of a free country, and one who had experience in the practical operation of

a government by the people, while his critic was a citizen of Germany, and who had but a theoretical knowledge of a republican form of government. We cannot agree that Judge Cooley accepted Mr. Jameson as authority without an independent investigation for himself, as the citations to the section quoted refer to many leading cases on the subject and would indicate that this eminent writer had. given the subject independent investigation. Judge Cooley, in speaking of the work of Mr. Jameson, says: "This work is so complete and satisfactory in its. treatment of the general subject as to leave little to be said by one who shall afterwards attempt to cover the same ground." This indorsement by Judge ·Cooley should certainly counteract the criticism of Prof. Von Holst.

We cannot recede from the conclusion heretofore reached as to the acts on the subject passed by the Legislature of 1903, and are unable to say that a void ordinance can be made valid by a legislative act which is also void. "Two wrongs never make a right."

The rehearing is denied.

McClellan, C. J., and Haralson and Simpson, JJ., concur. Tyson, Dowdell, and Denson, JJ., dissent.