# Washington *v.* Washington.

*Petition for Dower.*

69  281
129  231

69  281
135  310

69  281
143  327

1. *Marriage between slaves invalid.*—During the existence of slavery, one of the disabilities to which it necessarily subjected the slave, was an incapacity to form the legal relation of husband and wife. Into that relation, depending upon a contract formed by the mutual and concurring assent of the parties to it, and involving mutual obligations and duties, the slave was incapable of entering, because of the paramount rights of the master, to which the will and ability of the slave were subordinated, and which were inconsistent with the power of the slave to contract, and with his yielding the assent, incurring the obligations, and performing the duties incident to marriage.

2. *Same; while invalid, not immoral.*—While slaves were incapable of contracting marriage under the municipal law of force during the existence of slavery, the relation of husband and wife entered into between them with the consent of the master, and solemnized with the customary rites and ceremonies, was not immoral, but imposed a moral obligation, which was recognized and respected by public opinion.

3. *Slaves emancipated by ordinance of 22d September, 1865.*—The institution of slavery ceased to have a legal existence in this State from and after the adoption, by the Constitutional Convention of 1865, of the ordinance of 22d September of that year, which declared that thereafter there should not be in this State "slavery nor involuntary servitude, otherwise than as a punishment for crime."—(Rev. Code, p. 53.)

4. *Ordinance of 29th September, 1865, ratifying and legalizing marriages between freedmen and freedwomen.*—The ordinance of the 29th September, 1865 (Rev. Code, p. 64), adopted by the convention in recognition of the necessity for a definition of the legal status of the population emancipated from slavery, living together as man and wife, commends itself to the moral sense, is eminently just, conservative of social order, promotive of morality, and preservative of the legitimacy and rights of the innocent

[Washington v. Washington.]

offspring of the pre-existing union it ratified and legalized, and belongs. to a class of legislation, which, when employed for such beneficent purposes, deserves the highest judicial consideration.

5. *Same ; its effect and operation.*—By force of the ordinance, all the legal infirmity of the relation between the parties to whom it applied, was removed, and they became man and wife. By the ordinance they were not compelled into an involuntary relation; but the voluntary relation which they had formed, and which, by continuance after emancipation, they had affirmed, so far as it was capable of confirmation by their own acts, was legalized.

6. *Same.*—This ordinance had no reference to, or effect upon mere illicit intercourse, not intended, or recognized by the parties as marriage. It is not the cohabiting *like* man and wife, but the cohabiting *as* man and wife, and in mutual recognition of the relation, the ordinance legalizes.

7. *Same; widow of freedman whose marriage was thereby legalized, entitled to dower.*—Under the operation of this ordinance, the marriage of two negroes, who intermarried in 1847, while they were both slaves, and who continued to live together as man and wife until their emancipation, and thereafter for several months after the adoption of the ordinance, was legalized, and on the death of the man, the woman, as his widow, was entitled to dower in his lands, although the man, in October, 1866, abandoned her, procured a marriage license and married another woman,. with whom he lived as his wife until his death.

APPEAL from Hale Probate Court.
Tried before Hon. JAMES M. HOBSON.
The facts are stated in the opinion.

THOS R. ROULHAC, for appellant.

THOS. SEAY, *contra.*

(No briefs came to the hands of the reporter.)

BRICKELL, C. J.—This was an application by the appellee to the court of probate, for an assignment to her as widow of Gus Washington, deceased, of dower in the lands of which he died seized and possessed. The contention in the court of probate. was confined to the single fact of marriage between the appellee and the decedent. The cause was submitted to, and heard by the judge of the court of probate without the intervention of a jury. The findings of fact by the judge are specially stated in the judgment rendered as follows: "Edie, the said petitioner, under a certain form, was, while both were in a state of slavery, married to the said Gus Washington, in the year 1847, and thereafter, and during the time they continued in a state of slavery they lived together after the custom of slaves, as man and wife; that they continued to live in the same way and manner up to the 29th day of September, 1865, and for several months thereafter, to-wit: some time in the fall of 1866. That petitioner had by said Gus several children and one born dead after the abolition of slavery. In the fall of the

year 1866, the said Gus Washington left the petitioner and obtained from the probate court of Green county, the court at: that time authorized to issue marriage licenses to parties located as Gus and Martha were, a marriage license under which the ceremony of marriage was performed between them, the said Martha and Gus, by F. M. Harris, then an acting justice of the peace, duly authorized to perform said ceremony. That said Gus Washington lived with and recognized as his wife, the said Martha, from that time until his death, and had by her several children, all of whom are under the age of twenty-one years. That the said Gus had been in the habit of visiting the said Martha before and during the year, 1865, and had by her a child before the ceremony above spoken of was performed." The pleadings are all supported by the preponderance of the evidence; and it may also be added that in 1487 Edie and Gus were the property of the same master, were married by his consent, the ceremony of marriage being performed by a minister of their own race; and with the consent of the master, as man and wife they cohabited until emancipation. An illicit intercourse sprung up between Gus and Martha, continuing until their marriage in October, 1866, and into the marriage they were induced by threat, or by the pendency of a prosecution against them for adultery. The judge of the court of probate adjuged that Edie was the lawful wife, and awarded to her dower.

It is certainly true, that while slavery existed, one of the disabilities to which it necessarily subjected the slave, was an incapacity to form the legal relation of husband and wife. That relation then depended, and now depends upon contract,—a contract formed by the mutual and concurring assent of the parties to it, involving mutual obligations and duties. The slave was incapable of contracting, of yielding the assent, of incurring the obligations, and performing the duties, because of the paramount rights of the master to which his will and ability were subordinated. In *Malinda v. Gardner*, 24 Ala. 719, this court, speaking of marriage as between slaves, said: "Persons in that condition are incapable of contracting marriage, because that relation brings with it certain duties and rights with reference to which it is supposed to be entered into. But the duties and rights which are deemed essential to this contract are necessarily incompatible with the nature of slavery, as the one can not be discharged, nor the other recognized without doing violence to the rights of the owner. In other words, the subjects of the contract must cease to be slaves before the incidents inseparable to the relation of marriage, in its proper sense, can attach." All this, it must be observed, refers to the relation of husband and wife, as established by, and the obligations and

[Washington v. Washington.]

duties which, according to the municipal law, flowed from the relation. As matter of fact, by universal usage, by the encouragement and consent of the master, the relation of husband and wife was formed between slaves, and often the marriage solemnized by the rites and ceremonies attending the solemnization of the marriage of their owners. The moral obligation resulting from the union, the master enjoined them to observe; and public sentiment so far respected the union, that the master who wantonly separated husband and wife, provoked from his neighbors indignation and reproach. While, in the contemplation of law, there was not a binding or obligatory marriage, there was a union of moral force and obligation. In *Smith v. State*, 9 Ala. 996, said ORMOND, J.: "whilst we admit the moral obligation which natural law imposes in the relation of husband and wife among slaves, all its legal consequences must flow from the municipal law."

When slavery was abolished—when the slave was emancipated from bondage and subordination to the master, the mass of adult freedmen and freedwomen were living as, and their children were born of the relation of, husband and wife, which they had formed while slaves. Whether, if after emancipation they had continued to live together as man and wife, contemplating and intending a continuance of the relation they had formed, they would not have been deemed married, and all the incidents, rights and duties the law attaches to marriage would not have flowed from their consensual cohabitation, founded upon a union not wanting in any element of morality, is not a question in this case, and can scarely become here a practical question.

In this State, the constitutional convention of 1865 (R. C. of 1867, p. 53), on the 22d September, adopted an ordinance in recognition of the fact that the events and results of the war had destroyed slavery; and declaring that thereafter, in this State, there should not be "slavery nor involuntary servitude, otherwise than as a punishment for crime." A similar provision was introduced into the constitution then formed, and has been introduced into the subsequent constitutions. From the adoption of that ordinance slavery ceased to have a legal existence in this State. A definition of the legal status of the population emancipated from slavery, living together as husband and wife, was a necessity. On the 29th September, 1865, the convention adopted an ordinance (R. C. 1867, p. 64), providing that "all marriages between freedmen and freedwomen, whether in a state of slavery or since their emancipation, heretofore solemnized by any one acting or officiating as a minister, or any one claiming to exercise the right to solemnize the rites of matrimony, whether bond or free, are hereby ratified and made

[Washington v. Washington.]

valid, provided the parties are now living together as man and wife; and in all cases of freedmen and freedwomen who are now living together recognizing each other as man and wife, be it ordained, that the same are hereby declared to be man and wife, and bound by the legal obligations of such relationship." Before the ordinance, the marriages occurring prior to emancipation, were wanting in legal obligation and incapable of legal recognition —were wanting in legal validity, because of the legal incapacity of the slave to yield assent, and to incur the legal obligations and duties of husband and wife. Their relation was not immoral, and was not unlawful, in the sense of falling within legal prohibitions. The ordinance commends itself to the moral sense, is eminently just, conservative of social order, promotive of morality, and preservative of the legitimacy and rights of the innocent offspring of the pre-existing union it ratifies and legalizes. There is no room to doubt the power of the convention to enact it, and it belongs to a class of legislation which, when employed for such beneficent purposes, deserves the highest judicial consideration.—*Goshen v. Stonington*, 4 Conn. 209. Similar legislation was adopted in all the States in which slavery was abolished, and its validity has not, so far as I know, been questioned.

In its practical operation, the ordinance accomplished but little more than an application of the principle of the common law touching the marriage of persons before reaching the age of consent, and the marriage of lunatics. The marriage of an infant before reaching the age of consent is inchoate and imperfect, and when the age of consent is reached, the marriage may be disaffirmed without divorce or judicial sentence. But if, on reaching the age of consent, the marriage is affirmed by a continuance of the relation, it is valid and incapable of dissolution by the voluntary act of the parties.—1 Black. 436; *Beggs v. State*, 55 Ala. 108. And if while one of the parties is insane, marriage is entered into, and after a lucid interval, after a restoration to reason, while there is capacity to consent, cohabitation is continued, it cures the infirmity of the contract, and the marriage becomes valid.—1 Bish. Mar. and Div. § 140. Mr. Bishop is of opinion these principles are applicable, after emancipation, to the marriage formed by slaves.—1 Bish. Mar. and Div. §§ 154–163. This view prevails in Louisiana (*Girod v. Lewis*, 6 Mart. La. 559; *Pierre v. Fontenette*, 25 La. Ann. 617); in Tennessee (*McReynolds v. State*, 5 Cald. 18); and in Missouri (*Johnson v. Johnson*, 45 Mo. 595). The reasons supporting it are thus expressed by MATTHEWS, J., in *Girod v. Lewis, supra:* "Emancipation gives to the slave his civil rights; and a contract of marriage, legal and valid by the consent of the master and moral assent of the slave, from the moment of freedom,

.although dormant in slavery, produces all effects which result from such contracts among free persons." This view was dissented from, and an opposite doctrine declared by PEARSON, C. J., in *Howard v. Howard*, 6 Jones L. (N. C.) 235. Upon this ·question we do not enter, for the facts of the case bring the relation shown to have existed between the petitioner and the decedent within the letter and spirit of the ordinance. By force of the ordinance, all the legal infirmity of their relation was removed and they became husband and wife. They were not compelled into an involuntary relation, but the voluntary relation they had formed, and which by continuance after emancipation they had affirmed, so far as it was capable of confirmation by their own acts, was legalized.

The ordinance of the convention had no reference to, and no effect upon mere illicit intercourse, not intended or recognized by the parties as marriage. It was not designed to sanctify such intercourse, inmoral and vicious in its origin and continu- ·ance. Under its operation, the relation existing between the decedent and Martha, however notorious or long continued, could not have ripened into marriage. As is said by the Supreme Court of Mississippi, it is not the *cohabiting like man and wife*, the ordinance legalizes, but the cohabiting *as man and wife*, and in mutual recognition of the relation.—*Runille ·v. Pegram*, 49 Miss. 751.

We find no error in the decree of the court of probate, and .it is affirmed.