# Bell, *et al. v.* Bell, *et al.*

### *Administration and Distribution.*

(Decided May 15, 1913.    Rehearing denied June 30, 1913.
62 South. 833.)

1. *Appeal and Error; Review; Finding.*—Where a contest of fact which is properly triable before a jury is submitted by consent for decision by the court the appellate courts will treat the judge's findings of fact as a verdict of the jury.

2. *Same.*—The finding of a trial judge as to facts, where the case is tried on written testimony will not be reversed on appeal unless there is a decided preponderance against the conclusion arrived ·at.

3. *Same;* Oral *Evidence.*—Where disputed questions of fact are tried before and decided by the trial court sitting as judge and jury, on testimony ore tenus, his finding will not be disturbed on appeal, unless it is so manifestly against the evidence that a trial judge would set aside a similar verdict rendered on the same testimony.

4. *Same; Appeal to Intermediate Court; Disposition of Cause.*—Where the issue was the validity of a marriage between a freed man and a freed woman, and the probate court correctly held on the evidence before it that there was a valid marriage, but should have granted a new trial on motion therefor supported by affidavit submitted as to newly discovered evidence the circuit court, on the appeal from the probate court, should have reversed and remanded the cause to the probate court for a new trial, and it·was error for that court to reverse the probate court and render judgment in favor of the opposite party.

(Sayre and deGraffenried, JJ., dissent.)

APPEAL from Jefferson Circuit Court.

Heard before Hon. JOHN C. PUGH.

Proceeding for the determination of distributees of the estate of Jim Bell, deceased.    Property having been awarded to George Bell and others, and a· motion for new trial by Mary Bell·and others having been de-

nied, they appealed to the circuit court, where the judgment was rendered for Mary Bell and others, from which George Bell and others appeal. Reversed and remanded, with instructions.

DAVID S. ANDERSON, for appellant. The circuit court acted in the capacity of the appellate court, and not as a trial court under section 2855, Code 1907, and hence, the wrong verdict was rendered. Prior to the Acts of 1911, amending section 2846, the action of the probate court on motions for new trial was not revisable.— *Nooes v. Garner,* 70 Ala. 443. Prior to the acts of February 16, 1891, the same rule was applicable to city and circuit court.—*Cobb v. Malone,* 92 Ala. 630. But under section 2846, and 2855, Code 1907, the trial is not de novo on an appeal such as this, and brings up for review only the orders appealed from, and not the correction of errors in the main trial.—*Carter v. Peck,* 121 Ala. 638; *Lee v. DeBardelaben,* 102 Ala. 628. "Newly discovered evidence is no ground for a new trial, unless it appears that the requisite diligence was used to discover the evidence *before the trial.—Jernigan v. Clark,* 134 Ala. 316; *McLeod v. Shelby & Co.,* 108 Ala. 81; *L. & N. v. Church,* 155 Ala. 329; *Ala. Midland Ry. v. Johnson,* 123 Ala. 197; *Woodward Co. v. Sheehan,* 166 Ala. 429; *Sou. Hardware Co. v. Black,* 163 Ala. 81. "On a motion for a new trial for newly discovered evidence, the materiality must not only be shown, but it must also appear that the failure to produce it *at the trial* was due to no lack of diligence on the part of the applicant."—*Garidona v. Ry.,* 60 South. 871. "Finding in determining a motion for a new trial for newly discovered evidence are presumptively correct, and the burden is on the appellant to show error."—*Garidona v. B'ham Sou. Ry.,* 60 South. 871. This being true the

[Bell, et al. v. Bell, et al.]

affidavits do not over-come this presumption. "Where newly discovered evidence consists wholly of admissions by plaintiff to third person an order denying a new trial will be sustained.—*Jones v. Tucker,* 132 Ala. 305. "The law exacts diligence from suitors, and, if necessary parties must, in the preparation of their cases, control and overcome difficulties."—*Frank v. Fabian,* 160 Ala. 210; *Allington v. Tucker,* 38 Ala. 655. "Contradictory or impeaching evidence will not warrant a new trial."—*Jones v. Tucker,* 132 Ala. 305. "Before a trial will be awarded for newly discovered evidence there must be a clear showing that by reasonable diligence it could not have been procured *before the trial.*"—*Smith v. B. R. L. & P. Co.,* 147 Ala. 702.

BONDURANT & SMITH, for appellee. On the question of when a new trial will be granted on newly discovered evidence, counsel cite *Cox v. Mobile Ry. Co.,* 44 Ala. 615; *W. Va. L. Co. v. May,* 166 Ala. 127; *White v. Blair,* 95 Ala. 148; *Cox v. B'ham Ry. Co.,* 50 South. 975, and cases cited under section 2846, Code 1907. The evidence that Jim Bell recognized George Bell as his son, could not be considered.—*Moore v. Heineke,* 119 Ala. 636; 6 Enc. of Evid. 476; 6 Mayf. 579. The presumption of an actual marriage from the fact of cohabitation is rebutted by the fact of a subsequent permanent separation and marriage of the parties.—*Weatherford v. Weatherford,* 20 Ala. 548, and authorities supra.

MAYFIELD, J.—The sole bone of contention in this case is, Who are the distributees of the estate of one Jim Bell, deceased, on account of whose wrongful death his administrator had received $1,000 for distribution as provided by the statute? The question was properly raised in the probate court, the evidence was there

heard ore tenus, and the probate judge decided the question in favor of appellants. An application for new trial was made in the probate court by appellees, and a great number of affidavits, in support of and in opposition to the motion, were introduced in evidence. The motion was denied by the probate court, and appellees (here) appealed to the circuit court, as is authorized by section 2855 of the Code. The trial was had in the circuit court on a transcript of the proceedings in the probate court, and the circuit judge, as an appellate court, by virtue of section 2865 of the Code, reversed the judgment of the probate court, and rendered judgment for appellants there (appellees here); and from that judgment this appeal is prosecuted to this court, as is authorized by section 2857 of the Code.

The progenitors of these respective statutes were construed by this court in the case of *Nooe's Ex'r v. Garner's Adm'r*, 70 Ala. 443, which was a proceeding very similar to this, though the question of fact to be determined was different. The rules of evidence as to the weight and sufficiency of evidence to justify an affirmance, a reversal, or a rendition, on the respective appeal, were thus declared by this court:

"Our former decisions have declared three rules, from which we have no wish to depart:

"First. When a contest of fact, properly triable before a jury, is, by consent, submitted to the judge presiding for decision. In this class of cases, this court will not review the finding of the judge on the facts, any more than it would the finding of a jury. It is not assignable as error.—*Etheridge v. Malempre*, 18 Ala. 565; *Barnes v. Mayor*, 19 Ala. 707; *Bott v. McCoy*, 20 Ala. 578 [56 Am. Dec. 223]; *De Vendell v. Hamilton*, 27 Ala. 156. We have a recent statute which authorizes the submission of disputed questions of fact to the court

without a jury, but it does not affect this case.—Code of 1876, § 3029.

"Second. When the case is properly triable before the court, as in chancery causes, but is tried on testimony reduced to writing, not examined in the presence of the court. A finding thus rendered is presumed to be correct, and will not be reversed in this court, unless there is a decided preponderance of evidence against the conclusion he attained.—*Rather v. Young,* 56 Ala. 94; *Bryan v. Hendrix,* 57 Ala. 387.

"Third. When the law authorizes the disputed question to be tried, and it is tried, by the court without a jury, on testimony given viva voce in the presence of the court. In such cases the rule is not to reverse the finding, unless it is so manifestly against the evidence that a judge at nisi prius would set aside the verdict of a jury rendered on the same testimony."—70 Ala. 446, 447.

After a careful examination of this record we are of the opinion that we should render a like judgment in this case to that rendered in *Nooe's Case, supra.* We have reached the conclusion that the probate judge rendered the proper judgment on the original hearing, but that he should have awarded a new trial on the showing made by movants, and that the circuit judge should have reversed and remanded to the probate court for a new trial, instead of reversing and rendering, as he did.

The sole disputed question was and is whether or not appellant here, Cornelia Jackson, was ever legally married to the deceased, Jim Bell, or whether their marriage as freedman and freedwoman was ratified and confirmed by the ordinance of September 22, 1865, relative to this subject. If the evidence of Cornelia Jackson is true, there was a valid marriage between her and

Jim Bell, and George Bell, the other appellant here, is their legitimate child, and hence the subsequent marriage between the appellee, Mary Bell, and deceased, was bigamous and void, and the daughter of this marriage, the other appellee, is an illegitimate child. As before stated, we are of the opinion that the evidence on the original trial before the probate court fully justified the probate judge in finding as he did, but that a sufficient showing was made, on the application for a new trial, to require that the probate judge order a new trial. This, in order that the testimony of Cornelia Jackson might be disproved if untrue, or corroborated if true. There is left no room to doubt from this record that the relation of husband and wife existed between Cornelia Jackson and the deceased prior to deceased's formal marriage to Mary Bell, and that George Bell is the child of that relation; but whether this relation was legal or illegal, and whether ratified by the ordinance of the Constitution of 1865, was the only disputed question. Upon its solution depend all other questions.

It was said by this court in the case of *Washington v. Washington,* 69 Ala. 281, in passing upon a similar question, and which was the first case construing the ordinance and declaring its effect: "As matter of fact, by universal usage, by the encouragement and consent of the master, the relation of husband and wife was formed between slaves, and often the marriage solemnized by the rites and ceremonies attending the solemnization of the marriage of their owners. The moral obligation resulting from the union the master enjoined them to observe, and public sentiment so far respected the union that the master who wantonly separated husband and wife provoked from his neighbors indignation and reproach. While, in the contemplation of law,

there was not a binding or obligatory marriage, there was a union of moral force and obligation. In *Smith v. State*, 9 Ala. 996, said Ormond, J., 'whilst we admit the moral obligation which natural law imposes in the relation of husband and wife among slaves, all its legal consequences must flow from the municipal law.' "

In the case of *Woods v. Moten*, 129 Ala. 228, 30 South. 324, it was said: "After emancipation, in order to ratify marriages between freedmen and freedwomen, and to legitimate the issue of such marriages or cohabitations, the convention of the people on the 29th of September, 1865, passed an ordinance declaring, among other things, that 'in all cases of freedmen and freedwomen, who are now living together recognizing each other as man and wife, be it ordained that the same are hereby declared to be man and wife, and bound by legal obligations of such relationship.' 'The issue of such marriage or cohabitation are hereby legitimatized, and shall be held to the same relations and obligations from and to their parents, as if born in lawful wedlock.'—Ordnance 39, Code 1867, p. 64."

It therefore follows that the judgment of the circuit court is reversed, and the cause remanded, that that court may reverse the judgment of the probate court and remand the cause to the probate court for another trial, whereat the questions of dispute will be reopened for further proof if it can be made.

Reversed and remanded, with instructions.

DOWDELL, C. J., and ANDERSON, McCLELLAN, and SOMERVILLE, JJ., concur. SAYRE and DE GRAFFENRIED, JJ., dissent, being of the opinion that the judgment of the circuit court should be affirmed.

DE GRAFFENRIED, J.—(dissenting).—Marriage is the "civil status or personal relation of one man and

woman, which was lawfully entered into, is intended to continue during their joint lives, is not dissoluble by their consent or agreement, and which involves the reciprocal rights and obligations imposed by law upon such unions."—26 Cyc. pp. 825, 832, subd. "d," and 837, subd. "b." Marriage is a union for the joint lives of the man and the woman, and can only be dissolved by the death of one of the parties to that union, or by a divorce from the bonds of matrimony. A man and a woman may live together *like* man and wife, and yet not be man and wife. The living together must contemplate that union which is to *continue* through the joint lives of the parties. Anything short of *that* is not marriage. Of course where a common-law marriage is relied upon, the acts of the parties and all that they said and did while living together are relevant as to what the parties intended by the relations which they established with each other. Where the parties obtained a license provided by statute and were married in accordance with the forms provided by statute, then the marriage is *conclusively* presumed, provided both parties were, at the time, capable of contracting the particular marriage (26 Cyc. 841) ; and he who assails such a marriage has the burden of proof on him to show its invalidity. While it is true that the rule in this state is "that marriage, like any other fact involved in a judicial inquiry, may be proved by circumstances, and direct and positive proof of the fact is not necessary." (*Bynon v. State,* 117 Ala. 80, 23 South. 640, 67 Am. St. Rep. 163), nevertheless this rule in no way conflicts with that other rule that "if a marriage has actually taken place, the presumption is in favor of its validity" (26 Cyc. p. 880, subd. 4, and authorities cited). We also take it that the above rule in no way conflicts with the rule that if there were conflicting marriages of the

same spouse, the presumption is that the second marriage is valid, and "the burden of showing the validity of the first marriage is on the party asserting it."—26 Cyc. p. 880, subd. 4, and authorities cited.

1. The undisputed facts in this case are as follows: On November 5, 1875, under a license issued on that day by Joseph Gothard, probate judge of Dallas county, Ala., Jim Bell was regularly married, by John Blevins, a minister of the gospel, to Mary Goldson. This marriage was in accordance with our statutes, and is shown by the records of Dallas county. Jim Bell and Mary Goldson were colored people and ex-slaves. After their said marriage they lived together continuously as husband and wife until Jim Bell was killed by the Tennessee Coal, Iron & Railway Company in October, 1910. During this period of 35 years, while these two people lived together as husband and wife, they raised a family of children and grandchildren, and at no time, during all that period, was the validity of their marriage questioned, and, so far as this record discloses, at no time during all that period was it claimed that Jim Bell had married previous to his marriage to said Mary Goldson. When Jim Bell was killed an administrator was appointed upon his estate, and this administrator collected $1,102.24 from the Tennessee Coal, Iron & Railroad Company for causing his death. This fund is the cause of this litigation, and if this fund had not appeared after Jim Bell's death, we think it plain that the validity of his marriage to Mary Galdson would never have been questioned by any one. About 25 years before the death of Jim Bell a woman, Cornelia, was married to a man by the name of Jackson, in Montgomery county, Ala., under a license regularly issued, and the marriage was solemnized according to the forms of law. She so testified, and she fur-

ther testified that there were six children born to her as the issue of this marriage. In spite of this marriage, however, this woman, Cornelia, and a son, George Bell, turned up, after the death of said Jim Bell, as claimants of said fund. They based this claim upon the proposition that shortly after emancipation—probably in August, 1865—this woman, Cornelia, was, by a minister of the gospel, but without license, married to said Jim Bell in Dallas county, and that after her marriage she lived with Jim Bell for several years, and while living with him as his wife bore him four children, among them George Bell, the others having died in infancy. In other words, this woman, Cornelia, by her testimony, if her testimony was true, brought herself, as the wife of Jim Bell, within the ordinance of September 29, 1865, which was construed and enforced by this court in *Washington v. Washington,* 69 Ala. 281. In the case of *Washington v. Washington,* the fact of the slave marriage and of the living together thereafter by the parties as husband and wife until the fall of 1866 was practically without dispute. In the instant case the only evidence which corroborates that of Cornelia as to her alleged marriage with Jim Bell is the evidence of her son, George Bell, unless, indeed, it be the fact that Jim Bell acknowledged that he was the father of George Bell, and after his marriage to Mary Goldson took George to live with him.

The fact that Jim Bell acknowledged George as his son we regard as possessing practically no value as evidence. The average negro, as a slave, and for a good many years after emancipation, regarded concubinage with as much complacency as did the patriarchs of old, and recognized, without hesitation or sense of shame, the child begotten by him out of wedlock. Neither are we disposed to place much faith in the uncorroborated

statements of Cornelia and George as to the alleged marriage. Cornelia claims that the preacher married her and Jim "out of the book," but she produced no person who witnessed this marriage, and in this statement she is contradicted by Bill Bell, a brother of Jim Bell. It is true that Bill Bell is himself contradicted, but we are inclined to think that his testimony is of as much value as that of a woman who, if her testimony is true, committed a felony when she married Jackson, and deliberately bastardized her children by Jackson in order that she might share in the fund to which we have above referred. Neither are we disposed to place much reliance upon the testimony of George. He was quite a young child when his father married Mary Goldson, and while he claims that he remembers the time when his father and Cornelia lived together, and remembers that they recognized each other as husband and wife, it should be remembered that he made *no* such claim at *any time* to Mary Goldson during the 35 years that his father lived with her as her *husband,* and seems to have refreshed his recollection as to *these early incidents* of his childhood only after this $1,102.24 came into the hands of Jim Bell's administrator. At any rate he nowhere testifies that he, at any time, questioned the legality of his father's marriage to Mary Goldson, or of his mother's marriage to Jackson, until after his father's death.

2. Marriage is a solemn thing. Upon it depends the title to our lands, the claim to our family names, and the vast interests which the laws governing the subject of the descent and distribution of the estates of those lying intestate protect. When, therefore, a marriage between a man and a woman is shown by the public records to have been duly solemnized, it should take a strong showing, indeed, for that marriage, in a pro-

ceeding of this sort, to be held for naught. The evidence showing that such a marriage was invalid—that children the issue of such a marriage are illegitimate —should be clear indeed.

When the fact of marriage rests in parol, then the law looks to the acts and conduct of the parties to ascertain whether they were, in fact, ever married to each other. In the instant case Cornelia and Jim Bell each did a thing which sharply challenged the truth of Cornelia's statements as to what the true relations between her and Jim Bell actually were, viz., Cornelia and Jim Bell each married—Cornelia, a man named Jackson, and Jim Bell the woman named Mary Goldson. "The weight of authority and the decision of this court support the proposition that the presumptions of an actual marriage from the fact of continued cohabitation, etc., is rebutted by the fact of a subsequent permanent separation, without apparent cause, and the actual marriage soon after of one of the parties."— *Moore v. Heineke,* 119 Ala. 627, 24 South. 374. In the instant case, *both parties* married; and, while Cornelia, to bring herself within the operation of the ordinance of September, 1865, referred to in *Washington v. Washington, supra,* testified that she and Jim were married by a minister of the gospel, this part of her testimony is without corroboration, and is in fact contradicted by her subsequent marriage to Jackson. She may possibly have testified truthfully, but, if so, she needed testimony independent of her own to overcome her subsequent inconsistent act, viz., her marriage to Jackson, which rendered her a felon in the eyes of the law, if she was, when she married Jackson, as she now claims to have been, a married woman. George Bell's testimony does not help her. George was not born, according to all the testimony, until some time in 1867—two

years after his mother's alleged marriage to Jim Bell. According to *his* testimony, Jim Bell, before he married Mary Goldson, was married to Harriet Winston, and he brought Harriet Winston in as a witness to prove this fact. Harriet swore that she also married Jim Bell before he married Mary, and that she lived with him as his wife about five years. The records of Dallas county show that Jim married Mary Goldson in November, 1875, and George could then have been only about eight years old. He claims that he lived with Jim Bell and Harriet Winston for some time before Jim was married to said Mary Goldson. If Harriet Winston swore truthfully—and she was the only witness on the part of appellants to the facts except the appellants themselves—then Jim Bell and Cornelia did *not* live together *after* 1870 and George could not have been, in 1870, more than three or four years old. It thus seems clear that George could not, in the nature of things, have known anything of the relations between his father and Cornelia. It is true that Cornelia claims to have lived with Jim for several years. It is also true that George claims to be old enough to remember when his father and mother lived together. But it is also true that he and Cornelia produced as their witness Harriet Winston and, in doing so, vouched for the truth of her statement that she also married Jim Bell, and that she lived with him for about five years. She testified: "After Jim Bell and myself were married, he brought a child to the place. The man here, George Bell, is the same boy that he brought. Jim Bell stayed with me about five years. I don't know how old George was when he was brought to me." It is, however, a noticeable fact that Harriet Winston does not claim that she ever heard of the alleged marriage of Jim Bell to Cornelia.

There is one fact in this record to which we can look with absolute confidence: *Jim Bell was married to Mary Goldson in November, 1875.* That *fact* is shown by the public records of Dallas county. We also *know* that after that marriage Jim Bell and Mary Goldson lived together as husband and wife for a period of *35* years, and until Jim Bell died. We do not think that this marriage can be held for naught, and the children of that marriage held to be bastards, upon the showing made by the testimony of Cornelia Jackson, George Bell, and Harriet Winston. The testimony of these people is too unsatisfactory and, in places too contradictory for us to hold to it as the truth and we have referred to its main features only for the purpose of illustrating its unsatisfactory character.

The probate judge, it is true, had evidence before him which we do not possess, viz., he had before him the demeanor of the witnesses while they testified before him. That evidence, however, can not affect our opinion. The witnesses may have possessed the demeanor most circumspect, and they may have given in their testimony with the most faithful air of truth. Their evidence, no matter how impressively it may have fallen from their lips, is not sufficient to overcome the strong presumption with which the law surrounds the marriage which was solemnized in November, 1875; and we must get something more than the testimony of a woman who undertakes to show that she is a bigamist, and something more than the testimony of the son of that woman —a son whose own testimony shows that his recollection as to the events to which he testifies cannot be reliable—before we can consent that a status so well defined as that which existed between Jim Bell and Mary Goldson for a period of 35 years shall be overturned. The testimony of these two witnesses may be true, but

it bears, within itself, too many evidences of its own falsity for us to place that high reliance upon it which the circumstances of this case demand.

Taking into consideration the extremely strong presumptions with which the law surrounds the marriage of Jim Bell and Mary Goldson, and the long period during which those parties, after that marriage, lived together as husband and wife, taking into consideration the inherent evidences of falsity which appear in the testimony of Cornelia Jackson, George Bell, and Harriet Winston, and the peculiar circumstances which gave rise to that evidence, it seems to us that the decree of the probate court was palpably against the evidence, and that it cannot be sustained.

3. The circuit judge evidently came to the above conclusions. We think that his judgment should be affirmed.

SAYRE, J., concurs in the above.